JOSEPH W. COTCHETT (SBN 36324)
ADAM ZAPALA (SBN 245748)
ELIZABETH CASTILLO (SBN 280502)
GRACE PARK (SBN 239928)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
gpark@cpmlegal.com

KARIN B. SWOPE (*pro hac vice forthcoming*)
**COTCHETT, PITRE & McCARTHY, LLP**
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
kswope@cpmlegal.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **JENNIFER B. CHIUCHIARELLI, APRIL H. YAMAICHI, KIYOMI ISHII,** and **RICHARD K. HOPPER** on behalf of themselves and all others situated, <br><br> Plaintiffs, <br><br> v. <br><br> **APPLE INC.** <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** <br><br> 1. **THE SHERMAN ACT – MONOPOLIZATION;** <br><br> 2. **THE SHERMAN ACT - ATTEMPTED MONOPOLIZATION;** <br><br> 3. **THE SHERMAN ACT – TYING;** <br><br> 4. **CALIFORNIA UNFAIR COMPETITION LAW** <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT

# TABLE OF CONTENTS

Page No.

I.   NATURE OF ACTION ................................................................................ 1

II.  JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT ............ 4

III. PARTIES ................................................................................................ 5

   A.   Plaintiffs .......................................................................................... 5

   B.   Defendants ....................................................................................... 5

IV.  FACTUAL ALLEGATIONS ....................................................................... 6

   A.   Apple, Inc. ........................................................................................ 6

      1.   Apple benefited from the United States' antitrust case against Microsoft. .8

      2.   Apple invited third-party investment on the iPhone and then imposed tight controls on app creation and app distribution.................................9

   B.   Apple benefited from Third-Party Creativity on Smartphones, which are Platforms. ............................................................................................ 11

   C.   Apple's Willful Acquisition and Maintenance of its Monopoly in the Smartphone and Performance Smartphone Markets .................................................. 12

      1.   Apple harms competition by imposing contractual restrictions, fees, and taxes on Super App creation and distribution. ...........................................12

         i.   Super Apps: Apple Stopped Super Apps from Threatening its .... 12

         ii.  Cloud Streaming Apps: Apple stopped developers from offering cloud gaming apps and services................................................... 15

      2.   Apple uses Messaging to control the behavior and innovation of third parties in order to insulate itself from competition. ...................................18

      3.   Apple restricts cross-platform digital wallets on the iPhone to create barriers to consumers to purchase competitors' smartphones .................20

      4.   Apple protects its monopoly by impeding the development of cross-platform smartwatches. ...........................................................................22

      5.   Apple creates barriers for iPhone users to purchase third party smartwatches....................................................................................23

      6.   Apple uses a similar approach to maintain its monopoly through many other products and services.......................................................................24

i

V.      ANTITRUST INJURY AND ANTICOMPETATIVE EFFECTS .................25

VI.     SECURITY AND OTHER ALLEGED COUNTERVAILING FACTORS
        DO NOT JUSTIFY APPLE'S ANTICOMPETITIVE CONDUCT ..................27

VII.    MARKET DEFINITIONS– THE SMARTPHONE AND SMARTWATCH
        INDUSTRIES.............................................................................................28
        A.      Relevant Markets ................................................................... 28
        B.      Apple has Monopoly Power in the Relevant Markets ........................... 28

VIII.   TOLLING OF STATUTE OF LIMITATIONS.........................................31

IX.     CLASS ACTION ALLEGATIONS ...........................................................33

X.      CAUSES OF ACTION ..............................................................................36

        FIRST CAUSE OF ACTION
        Violation of Sherman Act -- Monopolization
        (15 U.S.C. § 2)
        (Performance Smartphone Class) ............................................. 36

        SECOND CAUSE OF ACTION
        Violation of Sherman Act – Attempted Monopolization
        (15 U.S.C. § 2)
        (Performance Smartphone Class) ............................................. 39

        THIRD CAUSE OF ACTION
        Violation of Sherman Act -- Monopolization
        (15 U.S.C. § 2)
        (Smartphone Class).................................................................. 40

        FOURTH CAUSE OF ACTION
        Violation of Sherman Act – Attempted Monopolization
        (15 U.S.C. § 2)
        (Smartphone Class).................................................................. 43

        FIFTH CAUSE OF ACTION
        Violation of Sherman Act –Tying
        (15 U.S.C. §§ 1,3)
        (Apple Watch Class)................................................................ 44

        SIXTH CAUSE OF ACTION
        Violation of the California Unfair Competition Law
        (Cal. Business and Professions Code § 17200, et seq.)
        Unlawful and Unfair Prongs
        (Limited to California iPhone and Apple Watch Subclasses) ...................... 46

XI.     PRAYER FOR RELIEF ............................................................................47

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

XII.    **DEMAND FOR JURY TRIAL** ...................................................................................49

COMPLAINT



**APPLE'S ASCENT TO $3 TRILLION A YEAR –**

**THE USE OF DEVICES TO PREVENT COMPETITION.**

**I.    NATURE OF ACTION**

1.      The now iconic **Apple Inc.** was first called **Apple Computer Company** and founded on April 1, 1976, by Steve Jobs, Steve Wozniak and Ronald Wayne. Within twelve days of its founding, Wayne sold his shares back to Jobs and Wozniak. Apple was formed to produce and market the first personal computer called the Apple I that was hand-built by Wozniak. The first prototype of Apple I was introduced at a gathering of computer hobbyists at the Homebrew Computer Club in Menlo Park in July 1976. Apple I was not a true personal computer but a kit which came with a circuit board and pre-assembled chips that required a separately provided power supply, case, keyboard, power switch and video display.

2.      In January of 1977, **Apple Computer, Inc.** was incorporated. The Apple II was introduced on April 16, 1977, at the first West Coast Computer Faire as the first mass-produced microcomputer, with a case, an integrated keyboard, expansion slots for floppy disks, and other upgrades. In December 1980, Apple went public selling 4.6 million shares, generating over $100 million or more capital than any Initial Public Offering (IPO) since 1956 when the Ford

COMPLAINT

1  Motor Company went public.

2      3.      In January 2007, Jobs announced at the Microsoft Macworld Expo that Apple

3  Computer was renamed to **Apple, Inc.** because the company had shifted its emphasis from

4  computers to consumer electronics. The company introduced Apple TV, and the iPhone – which

5  became "a game changer for the industry."

6      4.      In July 2008, Apple launched the **App Store** which became a billion-dollar

7  business for Apple. In January 2010, Apple released the iPad and in June 2010, Apple released

8  the iPhone 4, which introduced video calling using FaceTime, multitasking, and other apps.

9      5.      In August 2018, Apple became the first publicly traded U.S. company to be

10  valued at over $1 trillion. In August 2020, it was valued at $2 trillion, at $3 trillion in January

11  2022, and at just over $3 trillion in August 2023.

12      6.      This case involves how Apple, Inc. created a business of using technology to

13  prevent purchasers from leaving Apple for any competition using illegal strategies to hold and

14  lock in Apple customers to the detriment of all phone purchasers.

15      7.      One only has to look at the following market dominance of Apple to understand

16  the full nature of the complaint.



**Top Smartphone OEMs' Share in Premium Market, 2022 vs 2023**

Source: Counterpoint Research's Market Pulse Service

28      8.      The Plaintiffs ("Plaintiffs"), on behalf of themselves and all others similarly

2

COMPLAINT

situated (the "Class" as defined below), on personal knowledge as to the facts pertaining to him and on information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and California unfair competition laws. Plaintiff demands a trial by jury and alleges as follows.

9.    Apple deters competition by designing iPhones to block cross-platform technologies between iPhones and Android smartphones in order to solidify, establish, and/or increase Apple's smartphone monopoly. In order to pursue its supracompetitive profits, Apple has blocked features and innovation on its iPhone resulting in Apple making the iPhone *worse* for consumers to prevent competition from emerging, which has the effect of unlawfully inflating the price of the iPhone. While Apple claims that it has prohibited the design and installation of cross-platform technologies on its smartphone platform for purposes of "security" and "privacy" interests, this is mere pretext. Apple has engaged in course of conduct designed to deter competition in the smartphone markets in order to obtain monopoly rents and supracompetitive profits on the iPhone.

10.    As a result of these barriers, Apple makes Android smartphones effectively less functional and less attractive to consumers, resulting in monopoly rents and supracompetitive pricing on the iPhone.

11.    Additionally, because of these cross-platform barriers, Apple is able to dominate the smartwatch market and charge supra-competitive prices for Apple Watch, the Apple



3

COMPLAINT

1  smartwatch product that is compatible with the iPhone.

2      12.    Accordingly, Plaintiffs and the putative Classes have overpaid or otherwise

3  suffered economic losses due to Apple's monopolization of these markets and therefore sue for

4  damages, injunctive relief, and other relief.

5  **II.    JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

6      13.    Plaintiff brings this action under Sections 4, 12, and 16 of the Clayton Act (15

7  U.S.C. §§ 15, 22, and 26) for treble damages, injunctive relief, other relief, and reasonable

8  attorneys' fees and costs with respect to the injuries sustained by Plaintiffs arising from

9  violations by Defendant of the federal antitrust laws, including Section 2 of the Sherman

10  Antitrust Act (15 U.S.C. § 2).

11     14.    This Court has jurisdiction over this action pursuant to Sections 1331, 1337(a)

12  and 1367 of Title 28 of the United States Code (28 U.S.C. §§ 1331, 1337(a) and 1367).

13     15.    This Court has *in personam* jurisdiction over Defendant because it: (a) it is

14  headquartered in this District; (b) transacted business in the United States, including in this

15  District; (c) is registered to do business in the state of California; (d) had substantial aggregate

16  contacts with the United States, including this District; and/or (e) engaged in anticompetitive acts

17  that were directed at, and had a direct, substantial, and reasonably foreseeable and intended

18  effect of injuring, the business or property of persons and entities residing in, located in, or doing

19  business throughout the United States, including in this District; (f) the anticompetitive designs,

20  testing and implementation of the iPhone originated in this District.  Defendants conduct

21  business throughout the United States, including in this District, and have purposefully availed

22  themselves of the laws of the United States.

23     16.    Venue is proper in this District pursuant to Sections 15 and 22 of Title 15 of the

24  United States Code (15 U.S.C. §§ 15 and 22) and Sections 1391(b) and (c) of Title 28 of the

25  United States Code (28 U.S.C. § 1391(b) and (c)) because Apple's principal place of business is

26  located in this District and substantial part of events and omissions giving rise to the claims

27  occurred in the District. Venue is also proper in this Court because Apple is located here, the

28

4

COMPLAINT

causes of action arose here, and the products at issue have been designed, manufactured and tested by Apple in this district.

17.    Pursuant to the Northern District of California's Civil Local Rule 3-2(c) & (e), the intradistrict assignment should be to the San Jose Division. This action arises in Santa Clara County because Apple is headquartered in Cupertino CA, and a substantial part of the events giving rise to these claims occurred in Santa Clara County, California.

## III.    PARTIES

### A.    Plaintiffs

18.    Plaintiff **Jennifer B. Chiuchiarelli** ("Plaintiff") is an individual and purchased and paid for an Apple watch SEGPS and an Apple iPhone.  Plaintiff is a resident of Atherton, California.

19.    Plaintiff **April H. Yamaichi** ("Plaintiff") is an individual and purchased and paid for an Apple iPhone 13.  Plaintiff is a resident of Burlingame, California.

20.    Plaintiff **Kiyomi Ishii** ("Plaintiff") is an individual and purchased and paid for an Apple iPhone.  Plaintiff is a resident of San Mateo, California.

21.    Plaintiff **Richard K. Hopper** ("Plaintiff") is an individual and purchased and paid for an Apple iPhone 12 and an Apple watch. Plaintiff is a resident of Foster City, California.

### B.    Defendants

22.    **Apple Inc.** ("Apple") is a corporation that was created under the laws of the State of California, and has its principal place of business in Cupertino, California. Apple is the world's largest information technology company by revenue, and the world's third-largest mobile phone developer. There are currently over one billion Apple products in active use worldwide.

23.    Apple has represented that the design, manufacture and testing of the iPhones has always been done by Apple, Inc., which is based in California.  *See* Transcript of House of Commons Standing Committee on Industry, Science and Technology.

COMPLAINT

IV.    **FACTUAL ALLEGATIONS**

A.    **Apple, Inc.**

24.    Apple is a global technology company with headquarters in Cupertino, California. Apple is one of the world's most valuable public companies with a market capitalization over $2.5 trillion. In fiscal year 2023, Apple generated annual net revenues of $383 billion and net income of $97 billion. Apple's net income exceeds any other company in the Fortune 500 and the gross domestic products of more than 100 countries.

25.    The iPhone, Apple's signature product, is the primary driver of Apple's growth and profitability, routinely commanding profit margins of more than 30 percent, which alone is significantly higher than its smartphone competitors.



26.    Apple increasingly extracts revenue from iPhone users beyond the initial smartphone sale. For example, Apple offers iPhone upgrades, apps and in-app payments, paid digital subscription services (e.g., Apple's music streaming, TV, news, gaming, fitness, and cloud storage subscriptions), accessories (e.g., tracking devices, headphones, chargers, iPhone cases), and more. Apple refers to these offerings as Services and Wearables, Home, and Accessories, respectively. It has been reported that, in fiscal year 2023, these offerings accounted for nearly

COMPLAINT

one-third of Apple's total revenue, or four times what Apple earned from selling Mac computers. Some of the largest drivers of revenue within these categories are Apple's smartwatch, the Apple Watch, and Apple's App Store, where iPhone users purchase and download apps. In recent years, Services have accounted for an increasing share of Apple's revenues, while the iPhone has remained the primary gateway through which U.S. consumers access these services.

27.    Apple's U.S. market share by revenue is over 70 percent in the "performance smartphone market"—a more expensive segment of the broader smartphone market where Apple's own executives recognize the company competes—and over 65 percent for all smartphones. These market shares have remained remarkably durable over the last decade. Apple's smartphone market shares understate Apple's dominance and likely growth in key demographics, including among younger American consumers. For example, one third of all iPhone users in the United States were born after 1996, as compared to just 10 percent for Samsung, Apple's closest smartphone competitor. Surveys show that as many as 88 percent of U.S. teenagers expect to purchase an iPhone for their next smartphone. iPhone users also tend to come from higher income households. Because smartphone users generally use a single smartphone to access related products and services, locking up key user groups allows Apple to capture greater spending on iPhone-related products and services, realize higher margins per user as compared to its smartphone rivals, and exercise greater control over developers and other smartphone ecosystem participants.



COMPLAINT



**Apple's ascent to $3 trillion**

After briefly peaking above $3 trillion in intra-day trading in January 2022, Apple's market capitalization is again in striking distance of that milestone

Source: Refinitiv
Created by Thomson Reuters

28.     In the fiscal year 2023, Apple spent $30 billion on research and development. By comparison, Apple spent $ 77 billion on stock buybacks during the same year.

**1.     Apple benefited from the United States' antitrust case against Microsoft.**

29.     The seminal antitrust case of *United States v. Microsoft* created new opportunities for innovation in areas that would be essential to Apple's success.  The iPod did not achieve widespread adoption until Apple developed a cross-platform version of the iPod and iTunes for Microsoft's Windows operating system, at the time the dominating operating system for personal computers.  Without *United States v. Microsoft,* it would have been more difficult for Apple to ultimately launch the iPhone.

30.     The pervasiveness of iPod and iTunes on Windows, in part because of a successful antitrust enforcement action against Microsoft, contributed to the development and success of Apple's next flagship product: the iPhone. But after launching the product, Apple began stifling the development of cross-platform technologies on the iPhone, just as Microsoft tried to stifle cross-platform technologies on Windows.

31.     Within a year of launching the iPhone, Apple invited third-party developers to

COMPLAINT

create apps for the iPhone. It has been reported that Apple released its first software development kit, which is essentially the digital tools for building native apps on Apple's operating system (iOS), to encourage and enable third-party developers to create their own apps for the iPhone. Apple also offered developers ways to earn money by selling apps and later in-app purchases and subscriptions. By 2009, Apple reportedly was running marketing campaigns highlighting the value that third-party apps provide to iPhone users with the trademarked slogan: There's an app for that. Apple's decision to invite third-party participation on its iPhone platform benefited Apple, too. The proliferation of third-party apps generated billions of dollars in profits for Apple and an iPhone user base of more than 250 million devices in the United States. Apple's market shares—over 70 percent of the "performance smartphone market" and over 65 percent of the "smartphone market" likely understate its monopoly power today.

32.　While Apple profits from third-party developers that increase the iPhone's value to users, Apple executives reportedly understand that third-party products and services can, in their own words, be fundamentally disruptive to its smartphone monopoly, decreasing users' dependence on Apple and the iPhone and increasing competitive pressure on Apple. Apple therefore willingly sacrifices the benefits it would gain from improved products and services developed by third parties when necessary to maintain its monopoly.

**2.　Apple invited third-party investment on the iPhone and then imposed tight controls on app creation and app distribution**

33.　Apple controls how developers distribute and create apps for iPhone users. For example, developers can only distribute iPhone apps through Apple's App Store, which is the only way for users to download native iOS apps. Limiting distribution to the Apple App Store enables Apple to exert monopoly power by imposing contractual restrictions and rules that limit the behavior of non-Apple apps and services. Specifically, Apple sets the conditions for apps it allows on the Apple App Store through its App Store Review Guidelines.

34.　Apple also controls app innovation by deciding which APIs are available to developers when they make third-party apps. For example, developers cannot provide apps on

COMPLAINT

the iPhone unless they enter into Apple's non-negotiable Developer Program License Agreement (DPLA). That agreement requires developers to use public APIs only in the manner prescribed by Apple. It also prohibits third-party apps from using what Apple designates as "private." Apple selectively designates APIs as public or private to benefit itself, limiting the functionality developers can offer to iPhone users even when the same functionality is available in Apple's own apps, or even select third-party apps. Similar to Apple's App Store restrictions, Apple uses its DPLA to impose restrictions that penalize and restrict developers that take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power.

35.     Apple's control over both app distribution and app creation gives Apple tremendous power, along with the ability to extract supracompetitive profits from iPhone sales. For example, Apple designates as private the need to send Short Message Service, or SMS, text messages, which is a protocol used by mobile carriers since the early 1990s to allow users to send basic text messages to other mobile phone numbers using their own mobile phone numbers. Developers have no technical means to access these private APIs, but even if they did, doing so would breach their developer agreement with Apple, and therefore put the developer at risk of losing the ability to distribute apps through the App Store. For example, Apple prohibits third-party iPhone apps from sending or receiving SMS text messages even though this functionality is available through Apple Messages. Likewise, Apple can control the functionality of third-party apps and accessories through its control of app distribution because if an app includes functionality that Apple does not like, Apple can and does block the app from the App Store.

36.     Apple's dominance is such that neither app developers nor iPhone users can benefit from lower cost or higher quality means of distributing apps or purchasing and providing digital products and services.  Apple guarantees that it continues to benefit from the contributions of third-party developers and other platform participants while also protecting itself from the competitive threats and those participants pose to Apple's smartphone monopoly.

37.     This complaint focuses on Apple's use of its dominance to impose contracts and

10

COMPLAINT

rules that restrict the behavior and design decisions of companies other than Apple, namely Android phone users.

38.    Apple uses its gatekeeping power over third-party app developers through arbitrary and unaccountable enforcement of its policies, which then protect the dominance of Apple's own services and stifles rivals.

**B.    Apple benefited from Third-Party Creativity on Smartphones, which are Platforms.**

39.    As the smartphone market has evolved, it started to replace use of personal computers. Smartphones are platforms.  Smartphones combine the functionality of a traditional mobile phone with advanced hardware and software components. This cluster of services and features results in a distinct product for consumers and developers. Smartphones not only are used to make phone calls, but also allow users to text others, to take photos, browse the internet, complete financial transactions, listen to music, etc.

40.    The technology and economics of a smartphone platform are fundamentally different from the technology and economics of a simultaneous transaction platform, such a credit card, because smartphone platforms compete over device features and pricing in ways that do not directly relate solely to app store transactions.  Consumers value smartphone platforms for a variety of reasons separate from their ability to facilitate a simultaneous transaction. Consumers care about the "non-transaction" components of the phone, such as its camera and processing speed, and they care about non-transactional components of apps, such as their features and functionality.  These features have value to a smartphone user.

41.    The economics of a smartphone platform are such that the platform's value to users increases when new apps and new features are added to the platform. In order to create these economic benefits for itself and its users, Apple opened its smartphone platform to third-party developers, whose countless investigations and innovations have created enormous value. Apple opened the platform to third-party developers to capture this value even though there is no extensive regulatory framework requiring it to do so or overseeing how it interacts with those

11

third parties.  In this case, smartphone platforms are different from other platforms or networks. When a third-party for the iPhone creates a valuable new feature, consumers benefit and consumer demand goes up for Apple's products, increasing the value of the iPhone to Apple. This has resulted in an enormously valuable smartphone reflecting the combined contributions of millions of developers.

42.    Limiting the features and functionality created by third-party developers makes the iPhone worse and deprives Apple of the economic value it would gain as the platform operator. It makes no economic sense for Apple to sacrifice the profits it would earn from new features and functionality unless it has some other compensating reason to do, such as protecting monopoly profits.

**C.    Apple's Willful Acquisition and Maintenance of its Monopoly in the "Smartphone" and "Performance Smartphone" Markets**

**1.    Apple harms competition by imposing contractual restrictions, fees, and taxes on Super App creation and distribution.**

43.    As reported and alleged by a governmental investigation, Apple's internal documents indicate that soon after the iPhone was introduced, Apple became concerned that third party interference on its platform would detract from Apples's profits from iPhone sales and related revenue streams.

**i.    Super Apps: Apple Stopped Super Apps from Threatening its Monopolies**

44.    As alleged in other lawsuits, Apple exercised its control of app creation and app distribution in key cases to cement the iPhone and App Store as the primary gateway to apps, products and services.  Apple has claimed that these rules and restrictions are required to protect a user's privacy or security to the Apple platform.  In fact, Apple imposed restrictions on access to their platform to frustrate disruptive competition for its iPhone platform fees and/or for the importance of the iPhone itself.

45.    Apple exercises its control over app distribution and app creation to dictate how

COMPLAINT

developers innovate for the iPhone, enforcing rules and contractual restrictions that stop or delay developers from innovating in ways that threaten Apple's power.  In so doing, Apple influences the direction of innovation both on the iPhone and Apple's competitors in the smartphone markets.

46.     Apple steers iPhone users away from products that compete with Apple.  In doing so, Apple increases cost and friction of switching from the iPhone to another smartphone and generates large profits through subscription services (like Apple's proprietary music, gaming and news services), advertisements in the App Store, and accessories like headphones and smartwatches.

47.     Apple also makes its competitors' products function more poorly, given the barriers Apple installs to cross-platform technologies, such that Android smartphone users move the purchasing iPhones, which allows Apple to charge supercompetitive prices for iPhones, and harming Plaintiff and Class Members by limiting consumer choice.

48.     Apple's monopoly maintenance has taken many forms and continues to evolve today; however, Apple's anticompetitive and exclusionary course of conduct is exemplified by its contractual rules and restrictions targeting several products and services: super apps, messaging apps, smartwatches and digital wallets.  By stifling these technologies, Apple reinforces its "moat" around its smartphone monopoly by discouraging innovation that threatens Apple's smartphone monopoly or the use of a more open system for the iPhone. Apple continues to expand the scope of its anticompetitive conduct such that the sum is greater than the parts, and Apple's conduct is even more powerful than that of each of its exclusionary acts alone.

49.     Apple prevented apps from threatening its smartphone monopoly by undermining mini programs that reduce user dependence on the iPhone.

50.     A super app is an app that can serve as a platform for smaller "mini" programs.

51.     Super apps are currently popular in Asia, Africa and Central America but haven't been adopted in North America (likely because of Apple's restrictions).   Super apps are generally popular with users because of the service integration and cost-effectiveness they

COMPLAINT

1  provide.  Examples of super apps are WeChat and Gojek, which are popular outside of the US,

2  but not in the United States.

3         52.    Super apps are written in programming languages such that they can cross

4  platforms, meaning that they can work the same on any web browser and on any device.

5  Developers can write a single mini program that works whether users have an iPhone or another

6  smartphone.

7         53.    Many companies and investors started to realize that creating a platform that

8  brings multiple services, such as ride-hailing, mobile payments, food delivery, and more into one

9  app, can potentially increase user engagement and retention, creating more revenue

10 opportunities.

11        54.    A super app refers to a mobile application that provides a wide variety of services

12 that typically go beyond what a traditional app does. Super apps have the ability to create

13 significant stickiness by having users engage with the app for a variety of reasons and for longer

14 periods of time. They also offer a new revenue stream for companies looking to expand their

15 offerings and reach new customers.

16        55.    It has been reported that Apple has denied its users access to super apps because it

17 viewed them as "fundamentally disruptive" to "existing app distribution and development"

18 paradigm, and ultimately Apple's monopoly power.  Apple reportedly feared super apps because

19 it recognized that as they become popular, demand for the iPhone is reduced.

20        56.    Apple used its control over app distribution and app creation to prohibit

21 developers from offering super apps instead of competing on the merits.

22        57.    As one Apple executive reportedly put it, "who doesn't want faster, easier to

23 discovery apps that do everything a full app does?" Restricting super apps hurts U.S. smartphone

24 users in order to make Apple more profitable.

25        58.    Super apps also reduce user dependence on the iPhone.  This is because a super

26 app is its own kind of middleware that can host apps, services, and experiences without requiring

27 developers to use the iPhone's APIs or code.

28

COMPLAINT

59.     As users interact with a super app, they rely less on the smartphone's proprietary software and more on the app itself.  In this way, users become more willing to choose a different smartphone because they can access the same interfaces, apps, and content on any smartphone where the super app is also present. Moreover, developers can write the mini programs gross platforms.  This lowers barriers to entry for smartphone rivals and decreases Apple's control over third-party developers and reduces switching costs.

60.     Apple recognizes that super apps with mini programs would threaten its monopoly. As one Apple manager reportedly put it, "allowing super apps to become the main gateway where people play games, book a car, make payments, etc. would let the barbarians in at the gate?" Because when a super app offers popular mini programs, stickiness goes down. Apple's fear of super apps is based on first-hand experience with the enormously popular super apps in Asia, such as WeChat. Apple does not want U.S. companies and U.S. users to benefit from similar innovations. For example, in a Board of Directors presentation, Apple reportedly highlighted the "[u]ndifferentiated user experience on [a] super platform as a major headwind to growing iPhone sales in countries with popular super apps due to the [l] ow stickiness and [l]ow switching cost." For the same reasons, a super app created by a U.S. company would pose a similar threat to Apple's smartphone dominance in the United States. Apple reportedly noted as a risk in 2017 that a potential super app created by a specific U.S. company would "replace[] usage of native OS and apps resulting in commoditization of smartphone hardware."

61.     Apple created, strategically broadened and aggressively enforced its App Store Guidelines to effectively block apps from hosting mini programs.  Apple's conduct disincentivized investments in mini program development and caused U.S. companies to abandon or limit support for the technology in the United States.

   **ii. Cloud Streaming Apps: Apple stopped developers from offering cloud gaming apps and services.**

62.     Cloud streaming apps let users run a computationally intensive program without having to store the program on the smartphone itself. Instead, a user's smartphone leverages the

computing power of a remote server, which runs the program and streams the result back to the phone. Cloud streaming allows developers to bring cutting-edge technologies and services to smartphone consumers—including gaming and interactive artificial intelligence services—even if their smartphone includes hardware that is less powerful than an iPhone.

63.    Cloud streaming has significant benefits for users. For example, Apple has promoted the iPhone 15 by promising that its hardware is powerful enough to enable "next-level performance and mobile gaming." But powerful hardware is unnecessary if games are played via cloud streaming apps. For a cloud game, the user experiences and plays the game on the smartphone, but the game is run by hardware and software in remote computing centers ("the cloud"). Thus, cloud gaming apps deliver rich gaming experiences on smartphones without the need for users to purchase powerful, expensive hardware. As a result, users with access to cloud streamed games may be more willing to switch from an iPhone to a smartphone because both smartphones can run desirable games equally well. Cloud streaming also has significant advantages for developers. For example, instead of re-writing the same game for multiple operating systems, cloud platforms can act as middleware that allows developers to create a single app that works across iOS, Android, and other operating systems. Cloud streaming provides more and simpler options for offering subscriptions, collecting payments, and distributing software updates as well. All of this helps game developers reach economies of scale and profitability they might not achieve without offering cloud gaming apps and reduces their dependence on iOS and Apple's App Store. Apple wielded its power over app distribution to effectively prevent third-party developers from offering cloud gaming subscription services as a native app on the iPhone. Even today, none are currently available on the iPhone. Apple has imposed the onerous requirement that any cloud streaming game—or any update to a cloud streaming game—be submitted as a stand-alone app for approval by Apple. Having to submit individual cloud streaming games for review by Apple increased the cost of releasing games on the iPhone and limited the number of games a developer could make available to iPhone users. For example, the highest quality games, referred to as AAA games, typically require daily or

16

1  even hourly updates across different platforms. If these updates need to be individually approved

2  by Apple, developers must either delay their software updates across all platforms or only update

3  their games on non-iOS platforms, potentially making the iOS version of the game incompatible

4  with other versions on other platforms until Apple approves the update. Neither option is tenable

5  for players or developers.

6       64.    For years, Apple blocked cloud gaming apps that would have given users access

7  to desirable apps and content without needing to pay for Apple hardware because this would

8  threaten its monopoly power. It has been reported that, in Apple's own words, it feared a world

9  where "all that matters is who has the cheapest hardware" and consumers could "buy[] a

10  [expletive] Android for 25 bux at a garage sale and … have a solid cloud computing device" that

11  "works fine." Apple's conduct made its own product worse because consumers missed out on

12  apps and content that would have been available via the cloud. This conduct also cost Apple

13  substantial revenues from third-party developers. At the same time, Apple also made other

14  smartphones worse by stifling the growth of these cross-platform apps on other smartphones.

15  Apple prevented the emergence of technologies that could lower the price that consumers pay for

16  iPhones.

17       65.    Until recently, Apple would have required users to download cloud streaming

18  software separately for each individual game, install identical app updates for each game

19  individually, and make repeated trips to Apple's App Store to find and download games. Apple's

20  conduct made cloud streaming apps so unattractive to users that no developer designed one for

21  the iPhone.

22       66.    Apple undermines cloud gaming apps in other ways too, such as by requiring

23  cloud games to use Apple's proprietary payment system and necessitating game overhauls and

24  payment redesigns specifically for the iPhone. Apple's rules and restrictions effectively force

25  developers to create a separate iOS-specific version of their app instead of creating a single

26  cloud-based version that is compatible with several operating systems, including iOS. As a

27  result, developers expend considerable time and resources re-engineering apps to bring cross-

28

17

1   platform apps like multiplayer games to the iPhone.

2       67.    Cloud streaming apps broadly speaking—not just gaming—could force Apple to

3   compete more vigorously against rivals. It has been reported that, as one Apple manager

4   recognized, cloud streaming eliminates "a big reason for high-performance local compute" and

5   thus eliminates one of the iPhone's advantages over other smartphones because then "all that

6   matters is who has the cheapest hardware." Accordingly, it reduces the need for users to buy

7   expensive phones with advanced hardware. This problem does not stop at high-end gaming but

8   applies to a number of high-compute requirement applications.

9           **2.    Apple uses Messaging to control the behavior and innovation of third**

10          **parties in order to insulate itself from competition.**

11      68.    In 2022, Apple's CEO Tim Cook was reportedly asked whether Apple would fix

12  iPhone-to Android messaging. "It's tough," the questioner implored Mr. Cook, "not to make it

13  personal but I can't send my mom certain videos." Mr. Cook's response? "Buy your mom an

14  iPhone."

15      69.    Messaging apps allow smartphone users to communicate with friends, family and

16  other contacts.  Smartphone messaging apps operate using 'protocols' which are the systems that

17  enable communications and determine the features available when users interact with each other

18  via messaging apps.

19      70.    One important protocol used by messaging apps is SMS.  SMS offers a broad user

20  network, but limited functionality.  For example, all mobile phones can receive SMS messages,

21  for cross-platform communications, *i.e.* messaging between iPhone and Android users. However,

22  SMS does not support modern messaging features, such as large files like videos, edited

23  messages, or reactions like a "thumbs up" or a heart.

24      71.    Many messaging apps use proprietary, internet-based protocols, which are

25  sometimes called OTT ("over the top") protocols.  OTT messaging usually used more secure and

26  advanced features, such as the ability to share rich media, typing indicators and encryption. OTT

27  only works between users to sign up and communicate through the same messaging app.

28

COMPLAINT

72.      Apple doesn't allow third party developers to access the APIs needed to implement SMS. As a result, third party messaging apps cannot combine the "text to anyone" functionality of SMS with the advanced features of OTT messaging. Instead, if a user wants to send a message in a third-party messaging app, they must first confirm whether the person they want to talk to has the same messaging app and, if not, convince that person to download and use a new messaging app. By contrast, if an Apple Messages user wants to send a message, they just type their phone number into the To: field and send the message because Apple Messages incorporates SMS and OTT messaging.

73.      Apple prohibits third-party developers from incorporating other important features into their messaging apps as well. For example, third-party messaging apps cannot continue operating in the background when the app is closed, which impairs functionality like message delivery confirmation. And when users receive video calls, third-party messaging apps cannot access the iPhone camera to allow users to preview their appearance on video before answering a call. Apple Messages incorporates these features.  If third-party messaging apps could incorporate these features, they would be more valuable and attractive to users, and the iPhone would be more valuable to Apple in the short term. For example, by incorporating SMS, users would avoid the hassle of convincing someone to download a separate app before sending them a message. Third-party messaging apps could also offer the ability to schedule SMS messages to be sent in the future, suggest replies, and support robust multi-device use on smartphones, tablets, and computers as they have already done on Android.

74.      Moreover, messaging apps benefit from significant network effects as more people use the app, there are more people to communicate with through the app, which makes the app more valuable and in turn attracts even more users. Incorporating SMS would help third party messaging apps grow their network and attract more users. Instead, Apple limits the reach of third-party messaging apps and reinforces network effects that benefit Apple.

75.      In addition to degrading the quality of third-party messaging apps, Apple affirmatively undermines the quality of rival smartphones .For example, if an iPhone user

COMPLAINT

messages a non-iPhone user in Apple Messages the default messaging app on an iPhone then the text appears to the iPhone user as a green bubble and incorporates limited functionality :the conversation is not encrypted, videos are pixelated and grainy ,and users cannot edit messages or see typing indicators .This signals to users that rival smartphones are lower quality because the experience of messaging friends and family who do not own iPhones is worse- even though Apple, not the rival smartphone ,is the cause of that degraded user experience. Many non-iPhone users also experience social stigma, exclusion, and blame for breaking chats where other participants own iPhones. This effect is particularly powerful for certain demographics, like teenagers where the iPhone's share is 85 percent, according to one survey. This social pressure reinforces switching costs and drives users to continue buying iPhones solidifying Apple's smartphone dominance not because Apple has made its smartphone better, but because it has made communicating with other smartphones worse.

76.    Apple recognizes that its conduct harms users and makes it more difficult to switch smartphones. For example, in 2013, Apple's Senior Vice President of Software Engineering reportedly explained that supporting cross-platform OTT messaging in Apple Messages "would simply serve to remove [an] obstacle to iPhone families giving their kids Android phones." In March 2016, Apple's Senior Vice President of Worldwide Marketing forwarded an email to CEO Tim Cook making the same point: "moving iMessage to Android will hurt us more than help us."

### 3. Apple restricts cross-platform digital wallets on the iPhone to create barriers to consumers to purchase competitors' smartphones

77.    Apple has blocked third-party developers from creating digital wallets on the iPhone with the important "tap-to-pay functionality."  Apples uses its control over app creation and API access to selectively prohibit developers from accessing the Near-Field Communication (NFC) hardware needed to provide tap-to-pay through a digital wallet app. Apple Wallet is the only app on the iPhone that can use NFC to facilitate tap-to pay.

78.    Apple Wallet is Apple's proprietary digital wallet, which uses Apple's proprietary

20

COMPLAINT

payment system Apple Pay.

79.    Cross-platform digital wallets would offer an easier, more seamless and secure way for users to switch from the iPhone to another smartphone.  May users already use apps created by their preferred financial institution.  If these financial institutions offered digital wallets, then users would have access to new apps and technologies without needing to share their private financial data with additional third parties, including Apple. In the short term, these improved features would make the iPhone more attractive to users and profitable for Apple.

80.    The absence of cross-platform digital wallets with tap-to-pay capability on the iPhone makes it harder for iPhone purchasers to purchase a different smartphone.

81.    Apple uses its smartphone monopoly power to block banks and merchants to develop better payment products and services for iPhone users, while encouraging these same banks and merchants to participate in Apple Wallet.

82.    Apple uses its smartphone monopoly to extract payments from banks, which need to access customers to use digital wallets on iPhones.  It has been reported that ?Apple has charged issuing banks 15 basis points (.15 percent) for each credit card transaction mediated by Apple Pay.  Payment apps from Samsung and Google are free to issuing banks.  Apple's fees are a significant expense for issuing banks and cut into funding for features and benefits that banks might otherwise offer smartphone users.

83.    Multiple app developers have sought direct NFC access for their payment or wallet apps.  Yet Apple prohibits these developers from incorporating tap to pay functionality in their apps for fear that it would threaten Apple Pay, leading to alternative payment apps that could operate cross-platform and undermine Apple's smartphone monopoly.

84.    Apple further impedes the adoption of third party digital wallets by restricting others from offering the same ability to authenticate digital payment options on online checkout pages.  By limiting the ability of third-party wallets to provide a simple fact and comprehensive solution to online purchasing, Apple further undermines the viability of such wallets and locks in consumers to continue to purchase iPhones.

COMPLAINT

85.    Apple creates barriers to cross-platform technologies to block iPhone users from leaving iPhones to use digital wallets on other platforms, and also block banks and merchants to create their own digital wallets in their apps to be allowed on the iPhone.  Plaintiffs and the Class are locked into the iPhone, and then are charged supra-competitive price for the iPhone.

### 4.    Apple protects its monopoly by impeding the development of cross-platform smartwatches.

86.    Apple uses smartwatches, a costly accessory, to prevent iPhone customers from choosing phones other than iPhones. Apple prevents third-party developers from innovating and limits the Apple Watch to the iPhone to bolster iPhone sales.

87.    Apple could compete with its smartphone competitors by creating a superior smartphone.  Instead, it thwarts competition acrost the smartphone market by creating barriers for Apple smartwatches to connect with smartphones other than iPhones.  Because of the significant cost of buying a smartwatch, users are less willing to choose a smartphone if it's not compatible with their smartwatch.

88.    Apple's smartwatch—Apple Watch – is only compatible with the iPhone. So, if Apple can steer a user towards buying an Apple Watch, it becomes more costly for that user to purchase a different kind of smartphone because doing so requires the user to abandon their Apple Watch and purchase a new, Android compatible smartwatch.

89.    By contrast, cross-platform smartwatches can reduce iPhone user's dependence on Apple's proprietary hardware and software.  If a user purchases a third-party smartwatch that is compatible with the iPhone and other smartphones, they can switch from the iPhone to another smartphone by simply downloading the companion app on their new phone and connecting to their smartwatch via Bluetooth. Moreover, as users interact with a smartwatch,  users rely less on a smartphone's proprietary software and more on the smartwatch itself. This also makes it easier for users to switch from an iPhone to a different smartphone.

90.    Apple recognizes that driving users to purchase an Apple Watch, rather than a third-party cross-platform smartwatch, helps drive iPhone sales and reinforce the moat around its

COMPLAINT

smartphone monopoly. For example, it has been reported that in a 2019 email the Vice President of Product Marketing for Apple Watch acknowledged that Apple Watch "may help prevent iPhone customers from switching." Surveys have reportedly reached similar conclusions: many users say the other devices linked to their iPhone are the reason they do not switch to Android.

91.    Apple uses its control of the iPhone, including its technical and contractual control of critical APIs, to degrade the functionality of third-party cross-platform smartwatches in at least three significant ways: First, Apple deprives iPhone users with third-party smartwatches of the ability to respond to notifications. Second, Apple inhibits third-party smartwatches from maintaining a reliable connection with the iPhone. And third, Apple undermines the performance of third-party smartwatches that connect directly with a cellular network. In doing so, Apple constrains user choice and crushes innovation that might help fill in the moat around Apple's smartphone monopoly.

### 5.  Apple creates barriers for iPhone users to purchase third party smartwatches.

92.    Apple also unlawfully ties Apple watches to its iPhones to arbitrarily restrict access to consumers purchasing alternative smart watches. The ability to respond to notifications, e.g., new messages or app alerts, directly from a smartwatch is one of the top considerations for smartwatch purchasers and one of the most used product features when it is available. It has been reported that, according to Apple's own market research, the ability to send and receive text messages from social and messaging apps is a critical feature for a smartwatch. In 2013, when Apple started offering users the ability to connect their iPhones with third-party smartwatches, Apple provided third-party smartwatch developers with access to various APIs related to the Apple Notification Center Service, Calendar, Contacts, and Geolocation. The following year, Apple introduced the Apple Watch and began limiting third party access to new and improved APIs for smartwatch functionality. For example, Apple prevents third-party smartwatches from accessing APIs related to more advanced Actionable Notifications, so iPhone users cannot respond to notifications using a third-party smartwatch. Instead, Apple provides third-party

COMPLAINT

1    smartwatches access to more limited APIs that do not allow users to respond to a message,

2    accept a calendar invite, or take other actions available on Apple Watch.

3        93.    A reliable Bluetooth connection is essential for a smartwatch to connect

4    wirelessly with a smartphone, and thereby function as a companion to the user's smartphone and

5    unlock its full functionality. But Apple prohibits third-party smartwatch developers from

6    maintaining a connection even if a user accidentally turns off Bluetooth in the iPhone's control

7    center. Apple gives its own Apple Watch that functionality, however, because Apple recognizes

8    that users frequently disable Bluetooth on their iPhone without realizing that doing so

9    disconnects their watch. As a result, iPhone users have a worse experience when they try to use a

10    third-party smartwatch with their iPhone. Apple also requires users to turn on Background App

11    Refresh and disable the battery-saving Low Power Mode in their iPhone settings for third party

12    smartwatches to remain consistently connected to their companion app, which is necessary to

13    allow a user's iPhone and their smartwatch to update and share data about the weather or exercise

14    tracking, even though Apple does not impose similar requirements for Apple Watch.

15        94.    Cellular-enabled smartwatches are popular with consumers.  Apple Watch users

16    use the same phone number for their smartphones and smartwatches when they connect to the

17    cellular network.  They have an integrated messaging experience – message go to both their

18    watches and phones.  Although it is technically feasible for Apple to allow an iPhone user to

19    connect with a third-party smartwatches in the same way, Apple requires these users to disable

20    Apple's iMessage service on their iPhone in order to use the same phone number on a third party

21    smartwatch. This is a barrier for iPhone users to use third party smartwatches, and drives iPhone

22    users to purchase Apple Watches rather than third party smartwatches.

23            **6.  Apple uses a similar approach to maintain its monopoly through many**

24                **other products and services.**

25        95.    The exclusionary and anticompetitive behavior reported above are part of Apple's

26    ongoing course of conduct to build and maintain a monopoly.  It has been reported and alleged

27    that Apple has deployed a similar playbook to prevent the development of cross-platform

28

COMPLAINT

1   technologies.

2       96.    For example, it has been reported and alleged that Apple has undermined third-

3   party location trackable devices to fully function across platforms.

4       97.    It has been reported and alleged that Apple has impaired third-party cross-

5   platform video communications apps while steering users to its own video communication app,

6   Face Time.

7   **V.    ANTITRUST INJURY AND ANTICOMPETATIVE EFFECTS**

8       98.    Apple's conduct has resulted in less choice for smartphone users. Today, only two

9   companies (Google and Samsung) remain as meaningful competitors to Apple in the premium

10  smartphone market.

11      99.    Apple's conduct has delayed or suppressed the emergence of cross-platform

12  technologies that would put competitive pressure on Apple's ability to extract extraordinary

13  profits from users and developers.  For example, third-party digital wallets would reduce Apple's

14  ability to charge banks high fees when users make payments using apple Wallet, which

15  ultimately cost consumers through higher prices and other reductions in quality.  Alternative

16  digital wallets could also provide smartphone users better rewards as well as a more private,

17  secure payment experience from a user's preferred financial institution rather than being forced

18  to go through Apple.  These tap-to-pay digital wallet products do not exist today because of

19  Apple's anticompetitive conduct.

20      100.   This leaves all smartphone users worse off, with fewer choices, higher prices and

21  fees, lower quality smartphones, apps, and accessories, and less innovation from Apple and

22  others.  It makes iPhone users worse off because they pay higher prices for a smartphone that has

23  less innovation and features, including cross platform technologies described herein.

24      101.   Apple's conduct has made its own products worse, sacrificing the short-term

25  profits Apple could earn from improving the iPhone in order to preserve the long-term value of

26  maintaining its monopoly. In a competitive market, Apple would compete aggressively to

27  support the development of popular apps and accessories for iPhone users, which would in turn

28

make iPhones more attractive to users and more valuable. But Apple takes steps to delay or suppress cross-platform technologies that it recognizes would be popular with users, such as super apps, because of the threat they pose to Apple's smartphone monopoly. As a result, several developers have abandoned plans to develop super apps even after making substantial investments in bringing them to market.

102. Apple has also impeded innovation by third-party smartwatches such that manufacturers have limited the functionality of their smartwatches for iPhone users, suspended support for iPhone compatibility because of Apple's restrictions, or canceled development of cross-platform smartwatches altogether. At least one company's canceled smartwatch formed part of its overall wearables strategy, including future development of virtual-reality technology. Similarly, Apple degrades third-party messaging apps, even though it makes cross-platform messaging less private and less secure for iPhone users, because doing so raises switching costs.

103. Apple's conduct has harmed other smartphone users, too. Because of the resources and risks required to maintain different features across different smartphones, many potential super app, mini program, and other developers do not implement features prohibited by Apple even on other smartphones. For example, prospective digital wallet providers, including U.S. banks, have abandoned the development of digital-wallet apps for either Apple or other smartphones. Another company decided not to offer users an innovative digital car key in part because Apple required that company to add any features related to the key into Apple Wallet rather than allowing that company to put its key solely in its own app. Other developers have shrunk, shuttered, or abandoned plans to launch super apps, smartwatches, and other apps. As a result, all smartphone users enjoy lower quality smartphones, less innovation, and less choice.

104. Plaintiff and Class Members purchased iPhones directly from Apple. Because of the anticompetitive conduct alleged in this Complaint, Plaintiffs and Class members are forced to continue to purchase iPhone and are forced to pay more for those iPhones than they would have absent Apple's alleged monopolization conduct. Apple therefore has caused Plaintiff and Class members to suffer overcharge damages. Without the unlawful restraints described above,

COMPLAINT

1   Plaintiff and Class Members would not have to pay supra competitive price for performance

2   smartphones and smartphones.  Apple's anticompetitive practices also stalled, limited or

3   foreclosed competition and innovation in the performance smartphone and smartphone markets.

4         105.    Plaintiffs and Class Members in the Apple Watch Class have been forced to

5   purchase Apple Watches in order to be compatible with their iPhones. The relevant market for

6   the Apple Watch subclass is the smartwatch market for smartwatches that are compatible with

7   Apple's smartphones and performance smartphones, i.e. iPhones. Apple coerces iOS consumers

8   to use and purchase Apple Watches by foreclosing would-be rival smartwatches from connecting

9   with the iPhone.  By virtue of Apple's tying conduct, consumers' only smartwatch option to

10   connect to the iPhone is Apple Watch.  Plaintiff and the Class are locked into purchasing Apple

11   Watches by virtue of their existing purchase of iPhones and pay supra-competitive prices for the

12   Apple Watch.

**VI.    SECURITY AND OTHER ALLEGED COUNTERVAILING FACTORS DO NOT JUSTIFY APPLE'S ANTICOMPETE CONDUCT**

15         106.    There is no valid procompetitive benefits of Apple's exclusionary conduct that

16   would outweigh its anticompetitive effects.  Apple's barrier-creating conduct against cross-

17   platform technologies has not resulted in lower prices, higher output, improved innovation or a

18   better user experience for smartphone users.

19         107.    Apple markets itself on the basis of privacy and security. But this does not justify

20   Apple's monopolistic conduct.  In fact, many alternative technologies that Apple's conduct

21   suppresses would enhance user security and privacy.  For example, Apple's conduct targeting

22   digital wallets forces users to share information with Apple even if they would prefer to share

23   that information solely with their bank, medical provider or other trusted third party.  When an

24   iPhone user provisions a credit or debit card into Apple Wallet, Apple intervenes in the process

25   that could otherwise occur directly between the user and card issuer introducing another point of

26   failure for privacy and security.

27         108.    Apple is also willing to make the iPhone less secure and less private if that helps

28

COMPLAINT

maintain its monopoly power.  For example, text messages sent from iPhones to Android phones, it has been reported, are unencrypted as a result of Apple's conduct.  If Apple chose it, it could allow iPhone users to send encrypted messages to Android users while still using iMessage on their iPhone , which would improve the privacy and security of iPhone and other smartphone users.

## VII.    MARKET DEFINITIONS– THE SMARTPHONE AND SMARTWATCH INDUSTRIES

### A.    Relevant Markets

109.    There are two relevant markets for the iPhone subclasses. The first relevant product market is the performance smartphone market.  The performance smartphone market is a narrower market within the broader smartphone market.  This narrower market includes those smartphones that compete with most iPhones and excludes lowest-end smartphones, which industry participants refer to as "entry-level" smartphones.

110.    Industry participants recognize performance smartphones as distinct and group these phones into the higher tiers such as "premium" or "flagship."

111.     The second relevant market is smartphones.  Smartphones are different from phones that offer less capable hardware and software options than smartphones. Smartphones are also distinct from other portable devices, such as tablets, smartwatches and laptop computers.

112.    The relevant market for the Apple Watch subclass is the smartwatch market for smartwatches that are compatible with Apple's iPhones.

### B.    Apple has Monopoly Power in the Relevant Markets

113.    Apple has monopoly power in the smartphone and performance smartphone markets because it has the power to control prices or exclude competition in each of them. Apple also enjoys substantial and durable market shares in these markets. Moreover, Apple's market shares likely underestimate Apple's power because they are protected by significant barriers to entry, network effects, and switching costs. Apple recognizes and exploits these barriers to entry, network effects, and switching costs to protect itself from competition from rival platforms and

COMPLAINT

1  innovations, products, and services that may diminish consumer reliance on the iPhone. Apple's

2  power will likely increase over time.

3      114.    In the U.S. market for performance smartphones, it has been reported that Apple

4  estimates its market share exceeds 70 percent. These estimates likely understate Apple's market

5  share today. For example, Apple's share among key demographics, including younger audiences

6  and higher-income households, is even larger. Even in the broadest market consisting of all

7  smartphones including many smartphones that Apple and industry participants do not view as

8  competing with Apple's iPhones and other higher-end phones— Apple's share is more than 65

9  percent by revenue. Similarly, even if consumers choose one phone over another, the vast

10  majority of developers consider iPhones and Android devices as complements because

11  developers must build apps that run on both platforms due to the lack of user multi-homing. In

12  effect, the lack of multi-homing among users necessitates multi-homing among developers. This

13  market reality increases the power that Apple is able to exercise over developers that seek to

14  reach users on smartphones especially performance smartphones that run sophisticated apps.

15      115.    Apple's high market shares are durable. Over the last decade, Apple increased it

16  share of smartphones sold in the United States most years. Through the same period, Apple

17  collected more than half the revenue for all smartphones sold in the United States.

18      116.    Apple's monopoly power in the relevant markets is protected by substantial

19  barriers to entry and expansion. For example, since fewer than ten percent of smartphone

20  purchasers in the United States are buying their first smartphone, there are fewer new customers

21  available for Apple's rivals. Instead, rivals must encourage existing iPhone users to switch from

22  using an iPhone to using another smartphone when they replace or upgrade their phone. As a

23  result, switching costs--many created or exacerbated by Apple--impose substantial barriers to

24  entry and expansion for rival smart phones. This barrier is increasingly impenetrable. It has been

25  reported that nearly 90 percent of iPhone owners in the United States replace their iPhone with

26  another iPhone. It has been alleged that at least one U.S. carrier estimates that as high as 98

27  percent of iPhone users on its network replace or upgrade their iPhone in a given quarter by

28

29

1    buying another iPhone. The increased switching costs that consumers experience because of

2    Apple's conduct underpins these exceedingly high retention rates.

3        117.    Apple's monopoly power in the relevant markets is protected by other barriers to

4    entry, expansion, or repositioning as well. For example, introducing a new smartphone requires

5    considerable investments in acquiring expensive and scarce components such as mobile chips

6    and specialized glass for screens. Other significant barriers to entry include product design,

7    software development, regulatory approval, manufacturing, marketing, and customer service.

8        118.    Because most smartphones are bought through mobile carriers including Verizon,

9    which has its operations headquarters in this district, new entrants or those seeking to expand or

10   reposition must meet the carriers technical requirements to access the major carrier networks in

11   the United States. New entrants and smaller rivals must also negotiate distribution agreements

12   and persuade carriers and other retailers to promote their products to consumers. As explained

13   above, rival smartphones must also overcome the substantial network effects generated by

14   interactions between users, developers, and others who interact with the iPhone.

15       119.    Apple's iPhone platform is protected by several additional barriers to entry and

16   expansion, including strong network and scale effects and high switching costs and frictions. For

17   example, if an iPhone user wants to buy an Android smartphone, they are likely to face

18   significant financial, technological, and behavioral obstacles to switching. The user may need to

19   re-learn how to operate their smartphone using a new interface, transfer large amounts of data

20   (e.g., contacts), purchase new apps, or transfer or buy new subscriptions and accessories. These

21   switching costs and frictions are even higher when software applications, and other functionality

22   do not help the different devices and operating systems communicate and interoperate. These

23   switching costs and frictions increase the stickiness of the iPhone, making users more beholden

24   to the smartphone manufacturer and platform operator.

25       120.    Many prominent, well-financed companies have tried and failed to successfully

26   enter the relevant markets because of these entry barriers. It has been reported that past failures

27   include Amazon (which released its Fire mobile phone in2014 but could not profitably sustain its

28

30

COMPLAINT

business and exited the following year);Microsoft (which discontinued its mobile business in 2017); HTC (which exited the market by selling its smartphone business to Google in September 2017);and LG (which exited the smartphone market in 2021).Today, only Samsung and Google remain as meaningful competitors in the U.S. performance smartphone market. It has been alleged that barriers are so high that Google is a distant third to Apple and Samsung despite the fact that Google controls development of the Android operating system.

121.    Apple's monopoly power is separately demonstrated by direct indicia  For example, Apple can and does profitably forego innovation without fear of losing customers to competitors.

122.    Apple's profits and profit margins, for nearly every aspect of the iPhone, are further evidence of Apple's monopoly power. For example, Apple's per-unit smartphone profit margins are far more than its next most profitable rival. Apple charges carriers considerably more than its rivals to buy and resell its smartphones to the public and employs contract clauses that may impede the ability of carriers to promote rival smartphones, a harmful exercise of monopoly power that is hidden to most consumers. Apple extracts fees from developers as much as 30 percent when users purchase apps or make in-app payments. Apple also extracts a 0.15percent commission from banks on credit card transactions through its digital wallet, while none of its smartphone competitors with digital wallets charge any fee. Apple predicts that it will collect nearly $1billion in worldwide revenue on Apple Pay fees by 2025.Arecent report by the U.S. Consumer Financial Protection Bureau suggest these revenues will only increase, as "analysts expect the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028.

123.    These indicia of Apple's monopoly power are direct evidence of its monopoly power in the relevant markets.

## VIII.    TOLLING OF STATUTE OF LIMITATIONS

124.    Plaintiff and Class members had no knowledge of Apple's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein,

31

1    during the Class period and continuing thereafter, until March 21, 2024 when the Department of

2    Justice filed its Complaint and provided details concerning Apple and its conduct.

3         125.    Plaintiff and Class members suffered economic loss due to Apple's wrongful

4    exercise of monopoly power. Plaintiff's interactions with Apple were insufficient, however, to

5    discover Apple's wrongful conduct.

6         126.    Furthermore, very little public information was available during the Class period

7    or thereafter that suggests Apples's business activities were done to monopolize the performance

8    smartphone and smartphone market until the Department of Justice filed its antitrust complaint

9    against Apple.

10        127.    Moreover, it was reasonable for Plaintiff and Class members not to suspect that

11   Defendant was engaging in any unlawful anticompetitive behavior.  Plaintiff and class members

12   are merely consumers of smartphones and performance smartphones were not active participants

13   in the market.

14        128.    Plaintiffs allege a continuing course of unlawful conduct by Apple, including

15   conduct within the applicable limitation periods. That conduct has inflicted continuing and

16   accumulating harm within the applicable statutes of limitation.

17        129.    For these reasons, the statutes of limitations applicable to Plaintiffs' and Class

18   members' claims have been tolled with respect to the claims asserted herein until the Department

19   of Justice filed its antitrust complaint against Apple on March 21, 2024.

20        130.    Additionally, or alternatively, application of the doctrine of fraudulent

21   concealment tolled the statutes of limitations on Plaintiff's claims. Plaintiff and Class members

22   had no knowledge of Apple's wrongful acquisition and maintenance of monopoly power in the

23   relevant markets, or of facts sufficient to place them on inquiry notice of their claims, during the

24   Class period and continuing thereafter. No information in the public domain or otherwise

25   available to Plaintiffs and Class members during the Class period suggested that Apple had

26   wrongfully acquired a monopoly or was using its monopoly power to charge supra-competitive

27   prices.

28

COMPLAINT

131.    In failing to disclose its wrongful monopolization, in addition to denying it was engaged in such conduct, Apple was able to conceal its illicit conduct.

132.    Further, Apple's anticompetitive monopoly conduct was inherently self-concealing because, as Apple knew, its disclosure likely would have led to governmental enforcement activity or civil liability.  Apple's conduct is subject to antitrust regulation, so it was reasonable for Plaintiffs and Class members to presume that it was purchasing smartphones and performance smartphones in a competitive market. A reasonable person under the circumstances would not have had occasion to suspect that smartphones and performance smartphones were being sold at supra-competitive prices at any time during the Class period.

## IX.    CLASS ACTION ALLEGATIONS

133.    Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of the following Class:

1.  All persons and entities who, as residents of the United States and during the period of March 27, 2020 to the date of class notice, that purchased a smartphone iPhone, ("Class Period").

2.  All persons and entities who, as residents of the United States and during the period of March 27, 2020 to the date of class notice, that purchased an iPhone performance smartphone;

3.  All persons and entities who, as residents of the United States and during the period of March 27, 2020 to the date of class notice, purchased any Apple Watch ("Apple Watch class")

134.    Plaintiffs also brings this action individually and as a California class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of the following Class:

4.  All persons and entities, who as residents of California, and during the period of March 27, 2020 to the date of class notice, that purchased a smartphone iPhone;

5.  All persons and entities, who as residents of California, and during the period of March 27, 2020 to the date of class notice, that purchased an iPhone performance

33

COMPLAINT

1    smartphone;

2        6.    All persons and entities, who as residents of California, and during the period of

3        March 27, 2020 to the date of class notice, that purchased any Apple Watch

4        135.    These definitions specifically exclude any of the Defendants named herein, any of

5    the Defendants' parent companies, subsidiaries, and affiliates, and any of the Defendants'

6    officers, directors, management, employees, subsidiaries, affiliates or agents. Plaintiff reserves

7    the right to expand, modify, or alter the class definition in response to information learned during

8    discovery.

9        136.    This action is properly brought as a class action under Federal Rule of Civil

10    Procedure 23(a) for the following reasons:

11        a.    Numerosity (Fed. R. Civ. P. 23(a)(1)): The proposed Classes are so numerous and

12        geographically dispersed that the joinder of all Class Members is impracticable. While

13        Plaintiff does not know the exact number and identity of all Class Members, Plaintiff is

14        informed and believe that there are millions of Class Members. The precise number of

15        Class Members can be ascertained through discovery;

16        b.    Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)): There

17        are questions of law and fact common to the proposed classes which predominate over

18        any questions that may affect particular Class Members. Such common questions of law

19        and fact include, but are not limited to:

20        i.    Whether Defendant monopolized the market for smartphones,

21        performance smartphones, or smartwatches;

22        ii.    Whether Apple unlawfully acquired and maintained monopoly power in

23        the relevant markets;

24        iii.    Whether Plaintiff and the other members of the Class were injured by

25        Defendants' conduct and, if so, the determination of the appropriate Class-wide measure

26        of damages;

27        iv.    Whether Plaintiff and other members of the Class are entitled to, among

28

COMPLAINT

1    other things, injunctive relief, and, if so, the nature and extent of such relief;

2              v.        Whether the alleged conspiracy violated the Sherman Act;

3              vi.       Whether the alleged conspiracy violated California's antitrust and unfair

4    competition laws;

5              vii.      Whether Defendants unjustly enriched themselves to the detriment of the

6    Plaintiffs and the members of the Class, thereby entitling Plaintiff and the members of the

7    Class to disgorgement of all benefits derived by Defendants; and

8              viii.     Whether the Defendant fraudulently concealed the conspiracy's existence

9    from Plaintiff and the members of the Class.

10   c.        Typicality (Fed. R. Civ. P. 23(a)(3)): Plaintiffs' claims are typical of the claims of

11   the members of the proposed Classes. Plaintiff and the Class have been injured by the

12   same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices

13   and conduct that give rise to the claims of the Classes and are based on the same legal

14   theories;

15   d.        Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)): Plaintiff will fairly and

16   adequately protect the interests of the Classes in that he has no interests antagonistic to

17   those of the other members of the Classes, and Plaintiff has retained attorneys

18   experienced in antitrust class actions and complex litigation as counsel;

19   137.    This action is properly brought as a class action under Federal Rule of Civil

20   Procedure 23(b) for the following reasons:

21   a.        Declaratory and Injunctive Relief (Fed. R. C. P. 23(b)(2)): Certification under

22   Rule 23(b)(2) is warranted because Defendant acted or refused to act on grounds

23   generally applicable to the Class, thereby making appropriate final injunctive,

24   declaratory, or other appropriate equitable relief with respect to the Class as a whole.

25   b.        Superiority (Fed. R. Civ. P. 23(b)(3)): Certification under Rule 23(b)(3) is

26   appropriate because questions of law or fact common to members of the Classes

27   predominate over any questions affecting only individual members, and class action

28

35

COMPLAINT

treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

c.      The proposed Classes are ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class Member were infringed or violated in the same fashion;

138.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.      Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

b.      This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered, and uniformity of decisions will be insured;

c.      Without a class action, Class Members will suffer damages, and Defendant's violations of law will proceed without remedy while Defendants reaped and retained the substantial proceeds of their wrongful conduct; and

d.      Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of Sherman Act -- Monopolization**

**(15 U.S.C. § 2)**

**(Performance Smartphone Class)**

139.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

36

COMPLAINT

140.    Plaintiff brings this claim on his own behalf of each member of the Performance Smartphone Class described above.

141.    The relevant market is the U.S. market for performance smartphones, and Apple has monopoly power in that market.

142.    Apple has gained and maintains monopoly power in the relevant market by improper and unlawful means. More specifically, Apple has willfully acquired and maintained such power through an exclusionary course of conduct and the anticompetitive acts described herein.  Each of Apple's actions individually and collectively increased, maintained, or protected its performance smartphone monopoly.

143.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud stream, messaging, wearables and digital wallets.  The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

144.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.  Apple's anticompetitive acts  have had harmful effects on competition and the performance smartphone class.

145.    Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

146.    For the reasons stated herein, substantial barriers to entry exist in the relevant market.

147.    Apple has the power to exclude competition in the relevant market, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, to maintain and expand its monopoly power in that market.

37

COMPLAINT

148.    Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rival competitors in the U.S. market for performance smartphone purchases.

149.    Apple has behaved as alleged herein in an attempt to obtain a monopoly in the U.S. market for performance smartphone purchases, with the effect being that competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Further, Apple's actions have depressed output and stifled innovation and options for the classes as alleged herein.

150.    There is no business necessity or other pro-competitive justification for Apple's conduct.

151.    As a direct and proximate cause of Apple's conduct, Plaintiff and members of the Class have suffered antitrust injury. Plaintiff and the Class members paid significantly higher prices for performance smartphone purchases than they would have but for Apple's unlawful conduct. That conduct also deprived Plaintiff and Class members of improved quality and innovation in the relevant markets.

152.    Plaintiff and members of the Classes are entitled to damages, including treble damages, sustained because of Apple's monopolistic acts and practices.

153.    Plaintiff and members of the Classes are entitled to equitable relief as appropriate to cure Apple's monopoly conduct and restore competition in the relevant markets. Members of the Classes are regular users in the performance smartphone market, the smartphone market and the smartwatch and will continue to purchase such devices and suffer further injury if Apple's monopoly is not ended.

154.    Plaintiffs and the Classes also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Apple from continuing to charge supra-competitive prices for performance smartphone, smartphone and smart watch prices. See, e.g., 15 U.S.C. § 26.

COMPLAINT

**<u>SECOND CAUSE OF ACTION</u>**

**Violation of Sherman Act – Attempted Monopolization**

**(15 U.S.C. § 2)**

**(Performance Smartphone Class)**

155.   Plaintiff hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

156.   Plaintiff brings this claim on his own behalf and on behalf of each member of the Class described above.

157.   The relevant market is the U.S. market for performance smartphones.

158.   Apple has attempted to monopolize the U.S. performance smartphone market. More specifically, Apple has willfully acquired and maintained market power by its patently exclusionary conduct and the anticompetitive acts described herein.  Each of Apple's actions individually and collectively increased Apple's market power in the performance smartphone market

159.   Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables and digital wallets .The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances ,both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

160.   While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

161.   Apple's anticompetitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for performance smartphones.

162.   Apple has a specific intent to achieve monopoly power in the U.S. market for

39

1  performance smartphones. Now, and if its unlawful restraints are not checked, Apple has a

2  dangerous probably of success in the relevant market as defined by the Plaintiffs.

3    163.    Apple has behaved as alleged herein in an attempt to obtain a monopoly in the

4  performance smartphone market, with the effect being that competition is foreclosed, innovation

5  is stifled, and consumer choice is gravely diminished. Additionally, Apple has abused its market

6  power by charging supra-competitive sales of performance smartphones, and making rival

7  companies' performance smartphones operate more badly in hindering cross-platform

8  technologies. Further, Apples's actions have depressed output and stifled innovation and options

9  for the Class as alleged herein.

10    164.    There is no business necessity or other pro-competitive justification for Apple's

11  conduct.

12    165.    Plaintiff and the Class have been injured, and will continue to be injured, in their

13  property as a result of Apple's conduct, including by way of overpaying for performance

14  smartphones.

15    166.    Plaintiff is inclined to continue to purchase Apple performance smartphones in

16  the future because of their investment in the Apple platform and the barriers that exist in

17  changing to a rival performance smartphone.

18    167.    Plaintiff and the Class also are entitled to injunctive relief to prevent Apple from

19  persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an

20  injunction at a minimum prohibiting Apple from continuing to: charge supra-competitive

21  commission on sales of performance smartphones. See, e.g., 15 U.S.C. § 26.

22                    **THIRD CAUSE OF ACTION**

23              **Violation of Sherman Act -- Monopolization**

24                        **(15 U.S.C. § 2)**

25                      **(Smartphone Class)**

26    168.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph

27  as if fully stated herein.

28

40

COMPLAINT

169.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Smartphone Class described above.

170.    The relevant market is the U.S. market for smartphones, and Apple has monopoly power in that market.

171.    Apple has gained and maintains monopoly power in the relevant market by improper and unlawful means. More specifically, Apple has willfully acquired and maintained such power through an exclusionary course of conduct and the anticompetitive acts described herein.  Each of Apple's actions individually and collectively increased, maintained, or protected its smartphone monopoly.

172.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud stream, messaging, wearables and digital wallets.  The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

173.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.  Apple's anticompetitive acts  have had harmful effects on competition and the smartphone class.

174.    Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

175.    For the reasons stated herein, substantial barriers to entry exist in the relevant market.

176.    Apple has the power to exclude competition in the relevant market, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, to maintain and expand its monopoly power in that market.

41

177. Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rival competitors in the U.S. market for smartphone purchases.

178. Apple has behaved as alleged herein in an attempt to obtain a monopoly in the U.S. market for smartphone purchases, with the effect being that competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Further, Apple's actions have depressed output and stifled innovation and options for the classes as alleged herein.

179. There is no business necessity or other pro-competitive justification for Apple's conduct.

180. As a direct and proximate cause of Apple's conduct, Plaintiff and members of the Class have suffered antitrust injury. Plaintiff and the Class members paid significantly higher prices for smartphone purchases than they would have but for Apple's unlawful conduct. That conduct also deprived Plaintiff and Class members of improved quality and innovation in the relevant market.

181. Plaintiff and members of the Class are entitled to damages, including treble damages, sustained because of Apple's monopolistic acts and practices.

182. Plaintiff and members of the Class are entitled to equitable relief as appropriate to cure Apple's monopoly conduct and restore competition in the relevant market. Members of the Class are regular users in the smartphone market and will continue to purchase such smartphones and suffer further injury if Apple's monopoly is not ended.

183. Plaintiff and the Class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Apple from continuing to charge supra-competitive prices for smartphone prices. See, e.g., 15 U.S.C. § 26.

42

1

2

3

4

**FOURTH CAUSE OF ACTION**

**Violation of Sherman Act – Attempted Monopolization**

**(15 U.S.C. § 2)**

**(Smartphone Class)**

184.     Plaintiff hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

185.     Plaintiff brings this claim on his own behalf and on behalf of each member of the Class described above.

186.     The relevant market is the U.S. market for smartphones.

187.     Apple has attempted to monopolize the U.S. smartphone market. More specifically, Apple has willfully acquired and maintained market power by its patently exclusionary conduct and the anticompetitive acts described herein.  Each of Apple's actions individually and collectively increased Apple's market power in the smartphone market.

188.     Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables and digital wallets .The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances ,both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

189.     While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

190.     Apple's anticompetitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for smartphones.

191.     Apple has a specific intent to achieve monopoly power in the U.S. market for smartphones. Now, and if its unlawful restraints are not checked, Apple has a dangerous

43

1  probably of success in the relevant market as defined by the Plaintiffs.

2      192.    Apple has behaved as alleged herein in an attempt to obtain a monopoly in the p

3  smartphone market, with the effect being that competition is foreclosed, innovation is stifled, and

4  consumer choice is gravely diminished. Additionally, Apple has abused its market power by

5  charging supra-competitive sales of smartphones, and making rival companies' smartphones

6  operate more badly in hindering cross-platform technologies. Further, Apples's actions have

7  depressed output and stifled innovation and options for the Class as alleged herein.

8      193.    There is no business necessity or other pro-competitive justification for Apple's

9  conduct.

10     194.    Plaintiff and the Class have been injured, and will continue to be injured, in their

11 property as a result of Apple's conduct, including by way of overpaying for smartphones.

12     195.    Plaintiff is inclined to continue to purchase Apple smartphones in the future

13 because of their investment in the Apple platform and the barriers that exist in changing to a rival

14 smartphone.

15     196.    Plaintiff and the Class also are entitled to injunctive relief to prevent Apple from

16 persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an

17 injunction at a minimum prohibiting Apple from continuing to: charge supra-competitive

18 commission on sales of smartphones. See, e.g., 15 U.S.C. § 26.

19                              **FIFTH CAUSE OF ACTION**

20                          **Violation of Sherman Act –Tying**

21                               **(15 U.S.C. §§ 1,3)**

22                             **(Apple Watch Class)**

23     197.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph

24 as if fully stated herein.

25     198.    Apple has unlawfully tied Apple Watch to its mobile devices, namely the iPhone.

26     199.    As demonstrated above, the Apple Watch is a product in the market of

27 smartwatches compatible to Apple iPhones.  This market is distinct from the relevant market

28                                         44

from Apple's smartphone and performance smartphone markets. Apple's unlawful tying arrangement thus ties two separate products and that are separate markets.

200.    Apple exercise market power in the smartphone and performance smartphone markets (collectively called iPhone).

201.    Apple coerces iOS consumers to use and purchase Apple Watches by foreclosing would-be rival smartwatches from connecting with the iPhone.  By virtue of Apple's tying conduct, consumers' only smartwatch option to connect to the iPhone is Apple Watch.

202.    Apple's conduct forecloses competition in the market for smartwatches compatible with Apple iPhones.  Given the value and transactions and the money at issue, Apple's conduct affects a substantial violation of commerce in that market.

203.    Apple has thus engaged in a per se illegal tying arrangement.

204.    In the alternative only, even if Apple's tying conduct does not constitute a per se violation of the law, the rule of reason analysis of Apple's tying arrangement also would demonstrate that it violates the law.

205.    There is no valid business necessity or pro-competitive justification for Apple's tying conduct.

206.    Plaintiff and the Apple Watch Subclass have been injured, and will continue to be injured, in their business and property as a result of Apple's conduct, including by overpaying for smartwatches for Apple's iPhones.

207.    Plaintiff and members of the putative class have suffered and continue to suffer damages and irreparable injury, including ongoing harm to their business, and such damages and injury will not abate until the Court issues an injunction ending Apple's anticompetitive issues.

45

COMPLAINT

**SIXTH CAUSE OF ACTION**

**Violation of the California Unfair Competition Law**

**(Cal. Business and Professions Code § 17200, et seq.)**

**Unlawful and Unfair Prongs**

**(Limited to California iPhone and Apple Watch Subclasses)**

208.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

209.    Apple's conduct is unlawful in violation of California's Unfair Competition Law ("UCL") because it violates Section 2 of the Sherman Act, 15 U.S.C. § 2 (monopolization), and 15 U.S.C. §§ 1,3 (tying).

210.    Apple has engaged in unfair business practices through the conduct alleged herein, which has restrained competition. Apple's conduct is unfair and in violation of the UCL because it violates California's clearly established public policy forbidding monopolistic acts. Apple wrongfully acquired and unlawfully maintained monopoly power in the relevant markets through the conduct alleged herein.

211.    Apple's practices also are unlawful in violation of the UCL because they offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including in the form of artificially inflated prices, that greatly outweighs any possible utility from the practices.

212.    Apple's conduct is unfair in violation of California's Unfair Competition Law because it deprives consumers of innovation in technology, encourages substandard products in the relevant markets by Apple's competitors.  Apple's conduct is unfair because it provides barriers that prevent consumers from more seamless cross-platform technology.  Apple's conduct is also unfair because it violates the policy and spirit of the antitrust laws to prevent monopolistic behavior that hinders consumers choice and supra-competitive prices.

213.    Apple's conduct actually and proximately caused Plaintiff and Class members to lose money or property.  On behalf of the Class, Plaintiff seeks damages, injunctive relief, and

46

1    reasonable attorneys' fees and costs, as well as any other relief the Court may deem just or

2    proper.

3          214.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and Class members seek

4    from Defendant restitution and disgorgement of all earnings, profits, compensation, benefits, and

5    other ill-gotten gains obtained by Defendants for their violations of the UCL.

6          215.    Plaintiffs and the Class remain at risk of future harm and injury unless the

7    challenged practices, described above, are modified and enjoined. Pursuant to Cal. Bus. & Prof.

8    Code § 17203, on behalf of the Class, Plaintiffs seek an injunction prohibiting Defendant from

9    continuing its unlawful practices.

10          216.    Plaintiffs, on behalf of the general public of the State of California and pursuant

11    to id. § 17203 and *McGill v. Citibank*, N.A., 393 P.3d 85 (Cal. 2017), seek a court order for

12    public declaratory and injunctive relief to enjoin Defendant from such future misconduct, and

13    any other such order that may be necessary to prevent future harm and financial injury to

14    members of the general public who have not yet transacted with Defendant but are likely to in

15    the future. As set forth above, the general public is in need of protection from Defendant's

16    ongoing and continuing violations of the UCL. Such relief will create a public benefit. Plaintiffs

17    thus bring this action for public declaratory and public injunctive relief as a private attorney

18    general and to vindicate and enforce important rights affecting the public interest. Plaintiffs are

19    therefore entitled to an award of attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 for

20    bringing this action for public declaratory and injunctive relief.

21    **XI.    PRAYER FOR RELIEF**

22          WHEREFORE, Plaintiff requests that the Court enter judgment on his behalf and on

23    behalf of the Class defined herein, by adjudging and decreeing that:

24          1.    That the Court determine that this action may be maintained as a class action

25    under Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4) that Plaintiff be certified as

26    Class representative, and Plaintiff's counsel be appointed as counsel for the Class;

27          2.    That the unlawful contract, combination, or conspiracy alleged be adjudged and

28

decreed to be an unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act;

3.      That Defendant has violated the UCL by engaging in conduct that constitutes unlawful, unfair and fraudulent business practices;

4.      That Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

5.      That Plaintiff and the Class recover damages, as provided by law, determined to have been sustained as to each of them, in an amount to be trebled in accordance with the antitrust laws, and that judgment be entered against Defendants on behalf of Plaintiff and the Class;

6.      Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, costs, and expenses of the lawsuit, as provided by law;

7.      That Defendant, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

8.      That Plaintiff and the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

9.      That Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendant's past and ongoing restraint of trade, including:

    i.      A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendant; and

    ii.      Issuance of a permanent injunction against Defendant and their parents, subsidiaries, affiliates, successors, transferees, assignees and the Respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

48

COMPLAINT

10.     That Defendant are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class; and

11.     For such other and further relief as is just under the circumstances.

## XII.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff and the Class demand a trial by jury of all the claims asserted in this complaint that are so triable.

Respectfully submitted,

Dated:  March 27, 2024          **COTCHETT, PITRE & McCARTHY, LLP**

By:     _/s/ Joseph W. Cotchett_____

JOSEPH W. COTCHETT
ADAM ZAPALA
ELIZABETH CASTILLO
GRACE PARK
KARIN B. SWOPE (*Pro Hac Vice pending*)

*Counsel for Plaintiffs*

49

COMPLAINT